UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MICHAEL SEITZ,** | : | **Case No.: 07CV171** |
| | : | |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| v. | : | |
| | : | |
| **LANE FURNITURE INDUSTRIES,** | : | <u>**OPINION AND ORDER**</u> |
| **INC.** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

Before the Court is *Defendant's Motion for Summary Judgment* (Doc. 35), filed by the

Defendant, Lane Furniture Industries, Inc. ("Lane Furniture").  Lane Furniture seeks summary

judgment with respect to all claims.  Also before the Court is *Plaintiff's Motion for Partial Summary*

*Judgment* (Doc. 36) filed by the Plaintiff, Michael Seitz ("Seitz").  Seitz seeks summary judgment

with respect to only one of his claims, namely, that Lane Furniture violated the reinstatement

requirements of the Family Medical Leave Act, 29 U.S.C. § 2614.  Both of these motions are ripe

for adjudication.[1]  For the reasons articulated below, Lane Furniture's motion for summary judgment

(Doc. 35) is <u>**GRANTED**</u> and Seitz's motion for partial summary judgment (Doc. 36) is <u>**DENIED**</u>.

I.      <u>**INTRODUCTION**</u>

This is a sad case.  It demonstrates the destructive power of alcoholism, even in the face of

a man's best efforts to overcome the disease.  The action arises out of Michael Seitz's termination

by his long-time employer, Lane Furniture.  Seitz alleges that Lane Furniture terminated him in

violation of the Americans With Disabilities Act ("ADA") (42 U.S.C. § 12101 *et seq.*), the Ohio

---

[1] Seitz filed a response in opposition to Lane Furniture's motion for summary judgment (Doc. 44) on February 1, 2008, and Lane Furniture filed a reply in support (Doc. 47) on February 15, 2008. Lane Furniture filed a response in opposition to Seitz's motion for partial summary judgment (Doc. 42) on February 1, 2008, and Seitz filed a reply in support (Doc. 48) on February 15, 2008.

analog to the ADA (O.R.C. § 4112 *et seq.*), and the Family Medical Leave Act ("FMLA") (29 U.S.C.

§ 2601 *et seq.*).  In support of his State and Federal disability discrimination claims, Seitz alleges that

he suffers from alcoholism and depression, and that Lane Furniture terminated him because of these

disabilities.  In support of his FMLA claims, Seitz alleges that he was not reinstated to a substantially

similar position after returning from FMLA leave, and that he was terminated because he exercised

his right to FMLA leave.  Lane Furniture denies these allegations and contends that Seitz was

terminated simply because he stopped performing his job responsibilities effectively.

## II.   FACTUAL BACKGROUND

Lane Furniture admitted many of the allegations in Seitz's *First Amended Complaint* (Doc.

10-2) in its *Answer* (Doc. 14).  The Court thus has enough undisputed facts to establish the outlines

of the story that culminated in this lawsuit.  Furthermore, the briefs and supporting exhibits reveal

that the parties essentially agree to almost all of the facts related to Seitz's employment history, as

well as most of the items on the timeline of pertinent events.  Where there are disputes, that fact is

noted.

Michael Seitz is a resident of Erie County, Ohio who worked as a sales representative for

Lane Furniture from 1989 until his termination on January 9, 2006.  (*Compl.* and *Answer* ¶¶ 7, 31.)

Seitz's responsibilities as a sales representative involved visiting customers in his territory –

generally, northern Ohio – and attending to all of their sales needs.  (*See* Doc. 35, *Def. Br. Summ.

J.,* Ex. 1, *Seitz Dep.* 28.)

Seitz was regarded as a very good salesman during most of his tenure at Lane Furniture.  His

performance reviews were consistently excellent.  His direct supervisor from the time he was hired

until August of 2005, sales manager Sam Wise, described him as a "very dependable" and "good"

sales representative throughout the 1990s and until 2003.  (Doc. 47-3, *Wise Dep.* 111.)  In 1995, Seitz was named salesman of the year, and he was a member of the "President's Club"[2] in 1996.  (*Compl.* and *Answer* at ¶ 10.)  Seitz also testified at his deposition that he "felt he had close, dear friends at Lane."  It seems the feeling was mutual:  At his deposition, Sam Wise testified that he "tr[ied] to protect Mike [Seitz] over the years and cared a lot about Mike."  (*Wise Dep.* 54.)  Similarly, in an email from Wise's replacement, Jon Drosnock, to Greg Roy, the Executive Vice President of Sales and Marketing at Lane Furniture, in November of 2005, Drosnock stated that Seitz's "experience, . . . past work ethic, and relation skills are not easy to replace."  (Doc. 44-3, *Pl. Br. Opp'n*, Ex. 3.)

During his tenure as a sales representative, Seitz worked with three sales associates.[3]  The third sales associate, Jason Garner, began working with Seitz in 2001.  Seitz trained Garner and he was promoted to junior partner.  When he was promoted, Garner went from receiving a salary to sharing the commissions from all sales in the territory.  As junior partner, Garner handled the smaller accounts in the territory while Seitz serviced the larger accounts.  Initially, Garner received 20 percent of all commissions and Seitz received 80 percent.  In 2004, Garner's share was increased to 35 percent of all sales.  In July of 2005, Garner was promoted to full partner, and his share increased to 50 percent of all sales commissions.  At the same time, Lane Furniture transferred all but one of the large accounts in the territory from Seitz to Garner.  Seitz testified at his deposition that he

---

[2]  According to Seitz, the "President's Club" is "a performance related achievement bestowed upon the top performing salespersons in the company."  (Doc. 44, *Resp. Br. Opp'n* 2 (citing Doc. 44-2, *Seitz 2d Decl.* ¶ 11).)

[3]  Lane Furniture sales associates are assigned to a territory and assist the sale representative in servicing that territory.

supported Garner's promotion to junior partner and his initial commission share increase, but did not want him to be promoted to full partner in June of 2005. (*Seitz Dep.* 84-85.)

Even as he established a record of professional success and developed close personal relationships at Lane Furniture, Seitz struggled with alcohol abuse. In 1990, approximately one year after Seitz began working for Lane Furniture, he told Wise that he had an alcohol problem and would need to take time off work to undergo rehabilitation. (*Seitz Dep.* 46-48; *Wise Dep.* 56.) Seitz says that Wise told him at the time that the company took a "dim view" of alcoholism and, as a result, Seitz did not avail himself of the company health benefits for his treatment but paid out-of-pocket. [4] (*Seitz 2d Decl.* ¶ 4.) Seitz was given the time off requested and he returned to his same position, with no adverse consequences. Seitz was apparently sober for approximately eight to ten years.

In 2003, Seitz took a leave of absence under the FMLA. (*Id.* ¶ 14.) The leave of absence was related to a relapse of Seitz's alcoholism, and depression. (*Seitz 2d Decl.* ¶¶ 14-15; Doc. 35-2, *Def. Br. Summ. J.* 8-9.) Seitz attributes the relapse to "a number of factors, including the deterioration of [his] marriage." (*Seitz 2d Decl.* ¶ 14.) He returned to work after attending 90 Alcoholics Anonymous meetings in 90 days. (*Id.* ¶¶ 15-16.) Again, Seitz does not allege that any adverse employment consequences resulted from his 2003 leave.

In the Spring of 2005 Seitz struggled with alcoholism and depression again, and took ten weeks of FMLA leave. (*Compl.* ¶ 15; *Seitz Decl.* ¶¶ 22-23.) For approximately a week before Seitz

---

[4]    Lane Furniture does not deny that Wise told Seitz the company took a "dim view" toward alcoholism, but states that the remark pre-dates the enactment of the ADA and FMLA, and, therefore, is irrelevant to the analysis. Apparently conceding this point, Seitz does not argue that the remark has significance in this lawsuit, except to say that the words proved "prophetic" in 2005. (*Def. Resp. Br. Opp'n* 2.)

took leave in March of 2005, Wise and Jason Garner could not reach Seitz.  Demonstrating his

personal interest in Seitz's well-being, Wise described the time period as follows:

> Before he went into the clinic in March of '05, it was another period – I don't know
> how long – at least seven days where we couldn't find him.  And I was concerned.
> Q.     I'm sorry.  This is in '05?
> A.     '05.  I'm sorry.  Probably sometime in March of '05.  I don't know exactly
> the time line as far as when Mike went into the Cleveland Clinic.  But I had sent
> Jason – I was concerned that something had happened to Mike.  And I sent Jason,
> who was in the territory, up to Huron where Mike's home was.  And I tried to call
> Mike's home where Donna [*i.e.*, Seitz's ex-wife] was in Norwalk.  I tried to call
> Mike's parents.  And I tried to call anybody with the name Seitz in that area just to
> try to find out if they knew where Mike was.  I had no idea where Mike was.  His
> phone was – his cell phone wouldn't take any more messages.  We were concerned.
> I mean, I didn't know if Mike had had an accident.  And he was just gone.

(*Wise Dep.* 112-13.)  While on FMLA leave, Seitz received his share of the commissions from the

territory, while Garner and Wise serviced his accounts.

While Seitz was on FMLA leave during this period in 2005 Lane Furniture necessarily

assigned other personnel, including Garner, to cover Seitz's territory and communicate with his

customers.   During this time, Lane Furniture received numerous complaints about Seitz's

performance prior to the beginning of the leave period.  (*Wise Dep.* 66-69; Doc. 35-5, *Garner Dep.*

76-78.)  Lane Furniture submitted sworn declarations from two of Seitz's accounts – Sheely's

Furniture and Connell's Furniture – asserting that they requested then that Garner, not Seitz, act as

their sales representative because of Seitz's poor performance.  In addition, Garner and Wise testified

that they discovered numerous service-related problems at several of Seitz's accounts during this

period.

For example, the declaration of Sherry Sheely of Sheely's Furniture states, in part:

> As our business with Lane Furniture grew, Mr. Seitz provided excellent service.
> Unfortunately, during the last couple of years when Mr. Seitz serviced Sheely's his

performance declined.  In my opinion, he went from being one of our best sales representatives to one of our worst representatives.

(Doc. 35-18, *Sheely Decl.*)  Ms. Sheely's declaration also mentions offensive remarks she alleges Seitz made to female employees and confirms that she asked Wise to assign Garner to the account permanently.  (*Id*.)  Sheely's had been Seitz's largest account.

The Connell Furniture declaration similarly states:

In early 2005, I was advised by Lane Furniture that Mr. Seitz was taking a leave of absence.  Prior to his going on his leave of absence, his performance had declined considerably.  Essentially, he would not return calls and did not take care of things which he said he would take care of for our account.
. . .
I told Mr. Garner that I wanted him to remain as our representative.  I based my decision due to the better service which I receive from Mr. Garner.

(Doc. 35-19, *Connell Decl.*)

Before returning to work on June 13, 2005, Seitz met Sam Wise during the last week of May, 2005.  (*Seitz 2d Decl.* ¶¶ 28-29.)  Wise testified that he explained many of the customer complaints to Seitz at that time, and told Seitz that Garner was being promoted to full partner and would split commissions equally with Seitz.  Wise also informed Seitz that he was transferring all but one of the five largest accounts in the territory from Seitz to Garner.[5]  Wise told Seitz that the largest account, Sheely's Furniture, was being transferred because the customer complained about offensive remarks Seitz had allegedly made to female employees at Sheely's prior to taking FMLA leave and had specifically requested the transfer.  Seitz says that Wise also told him the changes were being made in an effort "to reduce [Seitz's] stress and anxiety."  (*Seitz Decl.* ¶ 27.)

---

[5]  The transfer of accounts had no separate effect on Seitz's commissions.  In other words, the commissions were shared on a territory-wide basis and the fact that Garner was asked to service the larger accounts did not change the fact that Seitz continued to share in the commissions earned from those accounts.

-6-

While Seitz denies that he ever behaved improperly when dealing with his customers and asserts that the only specific complaint Wise told him about was the one about offensive remarks to Sheely's employees, the evidence that Lane Furniture <u>received</u> complaints in the spring of 2005 from at least Sheely's and Connell Furniture is unrebutted.

Sam Wise retired in September of 2005. His interim replacement was Bob Phillips. Seitz stated in his declaration that he met with Phillips in October of 2005 and asked Phillips about his standing in the company in light of his FMLA leave. According to Seitz, Phillips said that everything was fine. (*Seitz Decl.* ¶ 39-40.) In November, Jon Drosnock took over permanently as sales manager of the territory.

On November 15, 2005, Greg Roy, the newly appointed Executive Vice President of Sales and Marketing at Lane Furniture, sent Drosnock the following email expressing concern about Seitz's sales numbers.

> Thanks for the update. Here is a disturbing signal however . . . . YTD Mike [*i.e.*, Seitz] is down in 13 out of his 16 accounts. Off a whopping $606,327 in volume! I'll be anxious to hear a report from Andreas as they are off $52k with us YTD. His performance ranks as the worst in the region and we need to have a plan to resolve quickly – we are out of time. It's unfortunate that you are walking into these tough situations in your first week but I hope you are seeing that we need to make certain that everyone has a solid business plan to achieve their quotas going forward. It is an absolute must that we have the most talented and self motivated sales force in place for the future. Our jobs are to produce results and as a manager you need to focus on making sure your team is pulling their weight and winning the battles. Monitor Mike's situation closely and keep me informed. 'Need to be thinking of your next move in that territory.

(*Def. Br. Summ. J.*, Ex. 12.)

On December 13, 2005, Seitz met with Drosnock, who informed him that he was being placed on probation because he was not keeping pace with his sales quotas. (*Compl.* and *Answer* ¶ 23.) Under the terms of the probation, if he did not meet certain average weekly quotas over the

next 60 days, Seitz would be terminated.  (*Id*. ¶ 24; *Pl. Br. Opp'n*, Ex. 3, *Probationary Status Letter*.)[6]

On December 27, 2005, Seitz contacted Drosnock to tell him that he had been hospitalized due to severe depression and alcoholism.  (*Compl.* and *Answer* ¶ 26; *Seitz 2d Decl.* ¶ 61.)  The parties are not in complete agreement with respect to what Seitz did between December 13, 2005 and December 25, 2005, but Seitz testified, and Lane Furniture does not dispute, that he was "in a fog, blackout period" and "not functional" after December 21st or 22nd, (*Seitz Dep.* 112), and that he checked himself in to the hospital "due to his alcoholism" on December 25, 2005.  (*Seitz 2d Decl.* ¶ 60).  More specifically, Seitz testified that he began drinking alcohol on "the 22nd or 21st" of December, 2005.[7]  (*Seitz Dep.* 100.)  While Seitz states in his declaration that he conducted business during the week of December 19, 2005, (*Seitz 2d Decl.* ¶ 56), at his deposition he could not recall whether he visited any customers during the week of December 19, 2005.  (*Seitz Dep.* 104-108.)  He

---

[6]  Seitz submits that his sales quotas for 2005 were not properly adjusted to reflect the fact that he lost ten weeks to protected FMLA leave and that the biggest accounts were transferred from him to Garner in June.  (*Pl. Resp. Br. Opp'n* 11-15; *Seitz 2d Decl.* ¶ 44-49.)  Based on this, he argues that his low sales numbers in late 2005 were misleading and that he should not have been put on probation on that ground.

Lane Furniture does not address whether the yearly sales quotas were properly adjusted or whether probation based on that data was fair.  Instead, it submits that the <u>weekly</u> sales quotas established in Seitz's probationary plan were fair and achievable, regardless of what prompted them, and that it was the failure to even approach those goals (much less to satisfy them) that ultimately contributed to Seitz's termination.  (Doc. 47-2, *Def. Br. Reply* 14.)  Lane Furniture points out, moreover, that, quotas aside, Seitz's failure to service his customers at all during the week of December 19, 2005, particularly in light of the prior expressions of customer dissatisfaction, provide sufficient performance-based grounds for his termination.  Because, as discussed below, the Court agrees that Seitz's non-performance in late December, 2005 was sufficient to justify his termination, regardless of his quotas, the Court declines to further analyze the fairness of Seitz's quotas.

[7]  December 21, 2005 was a Wednesday.

also says that, as far as he knows, no one from Lane Furniture, or from any of his customer accounts attempted to contact him during that week.

Lane Furniture contends that Seitz was unresponsive and grossly neglected his job responsibilities during the entire week of December 19, 2005.  It submits deposition testimony, emails and cell phone records in support of this contention.  (*See Def. Br. Summ. J.* 8, Exs. 9-11.) The submissions indicate that (1) Lane Furniture received numerous complaints from customers trying to reach Seitz during that time; (2) Drosnock tried to call him but could not leave a message because Seitz's voicemail box was full; (3) Drosnock faxed him requesting that Seitz call in but did not receive a response; and (4) Seitz did not make any work-related telephone calls until he called Drosnock on December 27, 2005 to tell him he had been hospitalized.

For example, Drosnock testified that, after failing to reach Seitz during the week of December 19th, he told Garner to check in with all of Seitz's accounts.  The following email from Garner to Drosnock dated December 23, 2005, summarizes the status of Seitz's accounts at that time and illustrates the complaints Lane Furniture was receiving from customers:

> Jon, yesterday I called Andreas, Countryside, St. Angelo Gage, Magalen, Sedlak Interiors, Watson's 87 and Kaplan's.  Countryside told me that Mike is up and down, Andreas made no mention of any problems, St. Angelo said they had not seen Mike since October and had received the February promotion and had no idea what it was, Kaplan's said that service from Mike is not what it should be, Watson's 87 said they had seen Mike once since they became his account, that they had a skeleton list of fabrics to work from, that they were dissatisfied with pretty much everything and were thinking of bringing in another line to replace us, and finally Sedlak Interiors said that the day before yesterday Mike missed his appointment with June Sedlak and that we were losing slots on their floor and they were thinking if they even needed us anymore.  Needless to say this all comes as a surprise to me and I am very discouraged to hear this.  I told all of them I would be back in the territory soon to handle their problems and specifically concerning Sedlak Interiors, Watson's 87, Griffiths and Gilbert these accounts need immediate attention and in some cases damage repair that may or may not require your intervention.  Jason Garner.

-9-

(*Def. Br. Summ. J.*, Ex. 23.)

In addition, Lane Furniture submits medical records related to Seitz's hospitalization on December 25, 2005 that suggest he started drinking heavily prior to December 21st. Robert Reeves, Jr., M.D. prepared a report on December 25, 2005 when Seitz was admitted to the Bellevue Hospital in Bellevue, Ohio. (*Def. Br. Summ. J.*, Ex. 13.)  In the report, Dr. Reeves states:

> HISTORY OF PRESENT ILLNESS: 49-year-old male with history of alcoholism, who over the past 10 days has relapsed into ethanol abuse.  Over the past 6 days, [Seitz] has been drinking an average of 30 beers per day.

(*Id.*)  When this report was presented to Seitz at his deposition, he denied drinking thirty beers a day for ten days, but said that he would have told Dr. Reeves the truth at the time the report was prepared.  (*Seitz Dep*. 112.)  At his deposition, Dr. Reeves stated that Seitz had been drinking for forty-eight hours prior to admission, and that Seitz had called him the day before the deposition to remind him of this timeframe. (*Reeves Dep*. 33-35.)  When his report was presented to Dr. Reeves at his deposition, however, he said that the report accurately reflects what Seitz told him.  (*Id.*)

At his deposition, Greg Roy testified that he decided to terminate Seitz on December 24, 2005, after Drosnock informed him that Seitz was unreachable and his customers were dissatisfied. (*Roy Dep*. 99-100.)  Drosnock corroborated this sequence of events at his deposition, testifying that he contacted Roy on December 24th after being unable to reach Seitz for several days and fielding customer complaints. (*Drosnock Dep.* 143.) On January 9, 2006, Seitz met with Drosnock and Greg Roy.  Roy informed Seitz that he had a choice: he could resign or be terminated, effective immediately.  (*Compl.* and *Answer* ¶¶ 28, 30.)  Seitz declined to resign and was terminated.  (*Id.* ¶ 31.)

-10-

Significantly, Greg Roy testified that he knew nothing about Seitz's struggles with alcohol, or that Seitz had taken FMLA leave at all when he terminated Seitz.  Roy says Seitz approached him in October of 2005 about his low sales numbers, but did not mention alcoholism or FMLA leave. (*Roy Dep.* 24-25.)

## III.    LAW AND ANALYSIS

### A.    Standard of Review

This case arises on cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> (1) *In General*.  A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify to the  matters stated.  If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.  The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

> (2) *Opposing Party's Obligation to Respond*. When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate,  be entered against that party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the

essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Singfield v. Akron Metropolitan Housing Auth.*, 389 F.3d 555, 560 (6th Cir. 2004). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

Both parties have filed motions for summary judgment. Lane Furniture's motion seeks dismissal of all of Seitz's claims. Therefore, the Court will consider it first.

### B.    Jurisdiction

Lane Furniture admits that this Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and diversity jurisdiction pursuant to 28 U.S.C. § 1332.  (*Compl.* and *Answer* ¶ 4.)  Likewise, Lane Furniture admits that venue is proper.  (*Id*. ¶ 5.)

The Court is satisfied that it has jurisdiction over each of Seitz's claims based on this admission, as well as its own independent review.  The ADA claim arises under federal law, and Seitz has fulfilled the requirement to exhaust his administrative remedies before filing suit.  He filed disability discrimination charges with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission ("OCRC") on May 19, 2006.  (*Id.* ¶ 46.)  The OCRC issued its Notice of Right to Obtain Judicial Review on October 5, 2006.  (*Def. Br. Reply*, Ex. 10.)  The EEOC issued a Notice of Right to Sue letter to Seitz on December 20, 2006.  (*Compl.* and *Answer* ¶ 46; Doc. 1-2.)  Approximately one month later, Seitz timely filed the complaint in this case.  The FMLA claims also arise under federal law, and the FMLA does not require the plaintiff to exhaust his administrative remedies prior to bringing a private suit.  *See Krohn v. Forsting*, 11 F.Supp. 2d 1082, 1085 (E.D. Mo. 1998) (holding that "[t]he FMLA does not contain an exhaustion requirement").  Accordingly, the fact that Seitz apparently did not mention the FMLA in his EEOC and OCRC charge is not a jurisdictional bar to his FMLA claims.  Finally, the Court has pendent jurisdiction over Seitz's state law disability discrimination claims pursuant to 28 U.S.C. § 1367.

### C.    Analysis

Seitz's first cause of action is for disability discrimination under Ohio law, O.R.C. § 4112 *et seq*.  His second cause of action is for disability discrimination under the federal ADA, 42 U.S.C. 12101 *et seq.*  Sixth Circuit law provides the general standards and applicable analysis for both the

federal and state disability discrimination claims under the circumstances of this case.[8]  *See Cox v.*

---

[8]  Seitz argues that the ADA and O.R.C. § 4112.01(A)(13) define "disability" differently, and, consequently, the elements of his federal and state disability discrimination claims are not identical. The ADA defines "disability" as one of three things: (1) a physical or mental impairment that substantially limits a major life activity; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(2).  The Ohio Revised Code defines "disability" as follows:

> "Disability" means a physical or mental impairment that substantially limits one or more major life activities . . .; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

O.R.C. § 4112.01(A)(13).  In *Johnson v. Metrohealth Med. Ctr.*, 2004 WL 1233954 (Ohio App. 8 Dist. Jun. 3, 2004), an Ohio Court of Appeals seized upon the fact that the Ohio definition does not expressly require that the impairment be a substantial limitation under the "record of" or "regarded as" alternatives in the definition.  Because of this difference, the *Johnson* court held that Ohio courts could not seek guidance from federal law regarding the definition of "disability."  *Id.* at 2.  First, the Court notes that *Johnson* is an unpublished Ohio Court of Appeals opinion that has been criticized by other Ohio appellate courts.  *See, e.g.*, *Vickers v. Wren Indus., Inc.*, 2005 WL 1685101, *7 (Ohio App. 2 Dist. Jul. 8, 2005).  Second, the issue has not been addressed by the Ohio Supreme Court after *Johnson*.  Third, the Sixth Circuit has consistently held, citing precedent from the Ohio Supreme Court, that it is appropriate to seek "guidance" from interpretations of the ADA in evaluating a disability discrimination claim under Ohio law.  *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 450 (6th Cir. 2007) ("Because '[t]he federal [ADA] is similar to the Ohio handicap discrimination law[,] ... [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.' ") (quoting *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 573 (Ohio 1998)).  Accordingly, it is appropriate for the Court to look to federal law in determining whether Seitz was disabled for purposes of his state law disability discrimination claim.  This approach is supported by decisions from the Northern District of Ohio in which courts have noted that, until the Ohio Supreme Court issues an opinion adopting the holding of the *Johnson* court, federal courts should not follow *Johnson*.  *See Cox v. True North Energy, LLC*, 524 F. Supp. 2d 927, 943 n.7 (N.D. Ohio 2007); *Hayest v. Cleveland Clinic Found.*, No. 1:06cv20, 2006 WL 2993415, *2 n.3 (N.D. 2006).  Finally, the distinction advanced by the *Johnson* court goes to whether or not Seitz is "disabled," which is only relevant to his *prima facie* case of disability discrimination.  As discussed in more detail below, Seitz's disability discrimination claims cannot survive summary judgment even if the Court assumes that he is "disabled," or regarded as such, for purposes of applicable law.  *Cf. Suslovic v. Black & Decker, Inc.*, 2007 WL 2153277, *14, n.21 (N.D. Ohio Jul. 23, 2007) ("While the weight of authority appears to be contrary to the *Johnson* holding, the Court need not reach this issue because even without such a requirement, plaintiff cannot establish that he was regarded as disabled.").

-14-

*True North Energy, LLC*, 524 F. Supp. 2d 927, 943 (N.D. Ohio 2007)[9] (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir.2004); *see also Martin v. Barnesville Exempted Vill. Sch. Dist. Bd. of Educ.*, 209 F.3d 931, 934 n. 2 (6th Cir.2000) (holding that "both federal and Ohio discrimination actions require the same analysis")).  In evaluating the state law claim, the Court may look to the ADA for guidance because the Ohio Supreme Court has held that the statutes are substantially similar.  *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 450  (6th Cir.2007) ("Because '[t]he federal [ADA] is similar to the Ohio handicap discrimination law[,] ... [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law.'") (quoting *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 573 (Ohio 1998)).  Accordingly, the issue before the Court with respect to Seitz's first two claims is whether material issues of fact exist with respect to any of the elements of disability discrimination, as interpreted by the Sixth Circuit.

---

[9]  In holding that Ohio Supreme Court authority permits this Court to look to federal law in interpreting whether Seitz is disabled, the Court does not go as far as the decisions in *Cox*, 524 F. Supp. 2d at 943 n.7, and *Hayest*, 2006 WL 2993415 at *2 n.3, however.  Discussing whether there is a difference between the ADA definition of "disability" and the definition at O.R.C. § 4221(A)(13), both the *Cox* and *Hayest* decisions include the following statement:

> [U]nless and until the Ohio Supreme Court interprets Ohio's statute otherwise, the Court applies the federal ADA analysis to Ohio § 4112 claims, which includes the definition of "disabled" found in 42 U.S.C. § 12102(2).

*Cox*, 524 F. Supp. 2d at 943 n.7; *Hayest*, 2006 WL 2993415 at *2 n.3.  A federal district court exercising supplemental jurisdiction over a state law claim must apply the substantive law of the forum state to the claim.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  Here, this means that the Court must start with the definition of "disability" set forth in the Ohio Revised Code, not the ADA definition.  *Cox* and *Hayest* are therefore incorrect to the extent that the footnotes indicate that the court should ignore the definition of "disability" in the Ohio Revised Code and apply the ADA definition.  Although as a practical matter this is the way federal courts within the Sixth Circuit have typically analyzed cases involving the ADA and Ohio claims at issue in this case, the statements in *Cox* and *Hayest* nonetheless appear to misstate the law applicable to exercising supplemental jurisdiction.

-15-

### 1. Disability Discrimination

The Americans with Disabilities Act states:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  In *Brohm v. JH Props., Inc.*, 149 F.3d 517, 520-21 (6th Cir. 1998), the Sixth

Circuit described the applicable test for ADA claims such as Seitz's as follows:

> To establish a prima facie case under the ADA, a plaintiff must show: (1) that he has a disability; (2) that he was otherwise qualified for his position; and (3) that the employer subjected him to discriminatory treatment solely by reason of his disability. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1178 (6th Cir.1996). If an employee establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for firing him. *Maddox* [*v. University of Tennessee*], 62 F.3d [843] at 846 [(6th Cir. 1995)].  Assuming that such a reason is given, the burden then shifts back to the employee to offer evidence that the proffered reason was in fact a pretext designed to mask discriminatory intent. *Id*.

*See also Roush v. Weaster, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).  This test mirrors the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden shifting analysis, and applies when the plaintiff has not alleged direct evidence of discrimination.  *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1184-85 (6th Cir. 1996) ("A *McDonnell Douglas* burden-shifting type analysis will . . . be appropriate in . . . cases in which the plaintiff has no direct evidence of discrimination and the employer disclaims reliance on the plaintiff's disability . . . ."); *see also Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 882 (6th Cir. 1996) (analyzing ADA claims "[u]nder the established framework for deciding discrimination cases set forth in *McDonnell Douglas Corp.*").  Seitz cites *Monette* for the applicable standard, and does not argue that he has presented direct evidence.  Accordingly, the burden-shifting approach is applicable here.

-16-

"On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000). "Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a *prima facie* case of discrimination has been established." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007). If Seitz can make out a *prima facie* case, the burden shifts to Lane Furniture.

### i. Seitz's *Prima Facie* Case of Disability Discrimination

Seitz's burden with respect to his *prima facie* case "is not onerous." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "Generally, at the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action 'under circumstances which give rise to an inference of discrimination.'" *Macy*, 484 F.3d at 364 (quoting *Burdine*, 450 U.S. at 253).[10] Seitz may present evidence sufficient to establish his *prima facie* case in various ways based on the facts at bar; there are no "rigid requirements that all plaintiffs with similar claims must meet regardless of context." *Id*. at 365 (citing *McDonnell Douglas*, 411 U.S. at 802 n.13). As stated by the Sixth Circuit:

> The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination.

*Id*. (citing *Burdine*, 450 U.S. at 253).

---

[10] In *Macy*, the Sixth Circuit noted that, at the summary judgment stage, the plaintiff need not satisfy the preponderance of the evidence standard to establish a *prima facie* case. 484 F.3d at 364 n.4. "[W]e have . . . made clear that a district court's duty in reviewing a motion for summary judgment is to 'determine[ ] if a plaintiff has put forth sufficient evidence for a reasonable jury to find her to have met the prima facie requirements.'" *Id*. (quoting *Cline*, 206 F.3d at 661).

-17-

### a.      Whether Seitz Is Disabled

The parties dispute whether Seitz has a disability, as defined by the applicable statutes.[11]  The definition of "disability" is set forth at 42 U.S.C. § 12102(2).  "Under the ADA, a "disability" means either (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment."  *Moorer v. Baptist Mem'l Health Care Sys.*, 398 F.3d 469, 480 (6th Cir. 2005) (citing 42 U.S.C. § 12102(2)).  'Major life activities' are generally everyday activities "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).

Relying on *Moorer*, Seitz argues only under the third definition of disability, *i.e.*, that Lane Furniture *regarded* him as having a physical or mental impairment that substantially limits a major life activity.  (*Pl. Resp. Br. Opp.* 17-18.)  In other words, Seitz denies that he is actually disabled from any major life activity, but asserts, instead, that Lane Furniture regarded him as such.  Although Seitz does not explicitly say so, it is clear from his brief that the "major life activity" at issue is working; he does not even present arguments pertinent to any other activity.  Noting the special rules related to cases depending on working as the major life activity which is allegedly limited, Lane Furniture argues that Seitz has presented no evidence that it regarded Seitz as substantially limited in the major life activity of working.

The Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491-93 (1999), noted that "working" is a difficult category of "major life activity" for courts to analyze.  *See also*

---

[11]   As discussed in footnote 8, the Court will apply Sixth Circuit authority to interpreting both the state and federal definition of "disability."

-18-

*Henderson v. Ardco, Inc.*, 247 F.3d 645, 650 (6th Cir. 2001) (citing *Sutton* and stating that: "Working," composed as it is of many activities, has been noted as a particularly problematic category for courts, requiring further elucidation.").  In *Moorer*, the Sixth Circuit discussed the standards applicable to working as a major life activity at length.  It noted:

> "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs" or " 'a broad range of jobs in various classes.'"  *Sutton* . . ., 527 U.S. [at] 491 . . . (quoting 29 C.F.R. § 1630.2(j)(3)(i).  "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i).

*Moorer*, 398 F.3d at 479.  In other words, an employee is not substantially limited in the major life activity of working unless the employer regards him as unable to work in more than one particular job.  *Id*. at 481 (quoting *Murphy v. United Parcel Serv.*, 527 U.S. 516, 523 (1999)).  Instead, the employee must show that the employer regards her as unable to work at "other employment suitable to her age, education, and experience and available in her geographic area."  *Gentry v. Summit Behavioral Healthcare*, 197 Fed. Appx. 434, 440 (6th Cir. 2006) (unpublished)  (citing *Henderson*, 247 F.3d at 652, 653 n.5).

*Moorer* identifies several steps for analyzing whether an employer regards a plaintiff as substantially limited in the major life activity of working.  398 F.3d at 479.  The first question is whether the employer regarded the plaintiff as having an impairment.  *Id*.  The second issue is whether the employer "mistakenly regarded that impairment as substantially limiting the major life activity of working."  *Id*.  Lane Furniture essentially argues that Seitz presents insufficient evidence with respect to the first step and does not even attempt to address the second step.

With respect to step one, as summarized above, the parties dispute whether the relevant decision-makers at Lane Furniture knew Seitz was an alcoholic.  For example, Greg Roy denies that

-19-

he knew Seitz had a drinking problem when he terminated him in January of 2006.  The record is at least sufficient to present a genuine issue of material fact on this issue, however, based on (1) Seitz's testimony that he discussed his alcohol problem with Sam Wise in 1990 and that both Wise and Seitz told the company about his alcoholism, (2) the fact that Wise testified that he personally considered alcoholism a disability, (3) the fact that the company approved his FMLA leave based, in part, on the stated reason that he was receiving treatment for alcoholism, (4) Seitz's testimony that he discussed having taken leave with Bob Phillips in the fall of 2005, and (5) Seitz's testimony that he mentioned his leave to Greg Roy around the same time (although this fact is expressly disputed by Roy).  Accordingly, the Court rejects Lane Furniture's argument that Seitz failed to present evidence sufficient to create a genuine issue of material fact as to whether it knew Seitz was an alcoholic.[12]

The real issue is whether Seitz has presented evidence sufficient to create a genuine issue of material fact with respect to the second step:  whether Lane Furniture regarded Seitz as substantially limited in his ability to work in a broad class of jobs or broad range of jobs in various classes.  *See Moorer*, 398 F.3d at 480.  Lane Furniture argues that Seitz has not presented any evidence connecting Seitz's alcoholism to a substantial limitation on the major life activity of working.

The evidence Seitz points to in his opposition brief – that the company knew he was an alcoholic, that Sam Wise personally considered alcoholism a disability, and that Jason Garner subjectively believed the company "considered Mr. Seitz unreliable because of his two prior leaves of absence for treatment for alcoholism" (*Pl. Resp. Br. Opp'n* 17-18) – does not address the

---

[12]  The parties assume that knowing one is an alcoholic is the same as "regarding" that person as having an impairment.  Since the Sixth Circuit has left no doubt after *Moorer* that alcoholism is an impairment, the Court proceeds on this assumption as well.

"substantially limited in a major life activity" requirement.  As discussed above, whether Lane Furniture regarded Seitz as having the impairment of alcoholism is just step one of the analysis.

The closest Seitz comes to arguing that Lane Furniture regarded him as unable to work at "other employment suitable to [his] age, education, and experience and available in [his] geographic area" *see Gentry*, 197 Fed. Appx. at 440, is his argument by analogy to *Moorer*.  Under *Moorer*, he argues that his leaves of absence due to alcoholism were critical to Lane Furniture's decision to terminate him, and, therefore, Lane Furniture believed his disability prevented him from doing his job.  As Lane Furniture points out, however, the evidence in *Moorer* included direct evidence that the employer both linked Mr. Moorer's performance failures to his alcoholism <u>and</u> that the employer perceived alcoholism to be a broadly debilitating disease that would prevent Mr. Moorer from engaging in any high-level management activity.  Lane Furniture argues that no such evidence has been presented by Seitz.

The Court declines to dissect these aspects of the *Moorer* decision as exhaustively as have the parties.  As *Moorer* itself makes clear, even if Seitz can cross the hurdle of showing that Lane Furniture's subjective view of his impairment went so far as to regard him as incapable of performing a broad class of jobs, there is yet one more hurdle Seitz's proofs must overcome – *i.e.*, the need to show that Lane Furniture's basis for altering his employment status or terminating him was by reason of his perceived disability.

For purposes of this motion, the Court will assume that Lane Furniture regarded Seitz as disabled by virtue of alcoholism and that he has satisfied this prong of his *prima facie* case.  While recognizing the parties continuing dispute on this threshold issue, given its other conclusions in this Order, the Court declines to address it further and, instead, proceeds to the next stage of the analysis.

**b.**     **The Remaining Elements of Seitz's *Prima Facie* Case**

Because the parties seem to agree that Seitz generally was qualified to perform his job, the Court also assumes that the second prong of Seitz's *prima facie* case is not at issue.  The third element of Seitz's *prima facie* case has two prongs – he must show that he suffered an adverse employment action and that the adverse employment action was <u>solely by reason of discrimination</u> based on his disability (or perceived disability).  *Macy*, 484 F.3d at 364 n.2; *Hedrick v. W. Reserve Case Sys.*, 355 F.3d 444, 454 (6th Cir. 2004), *cert. denied*, 543 U.S. 817 (2004).  Lane Furniture does not dispute that Seitz suffered two adverse employment actions.  Lane Furniture transferred his biggest accounts to Garner and lowered his commission percentage in June of 2005, and then terminated him in January of 2006.  Lane Furniture <u>does</u> dispute, however, that these adverse actions were discriminatory, and argues that they certainly can not be said to be <u>solely</u> motivated by a discriminatory purpose.

Notably, the 'solely by reason of' requirement at the *prima facie* stage of an ADA case is unique to the Sixth and Tenth Circuits.  *Macy*, 484 F.3d at 364 n.2 (citing cases illustrating the circuit split); *see also Monette*, 90 F.3d at 1178 (announcing applicability of 'solely by reason of' *prima facie* requirement in ADA cases); *Brohm*, 149 F.3d at 520-21 (applying 'solely by reason of' requirement at *prima facie* stage); *Hedrick*, 355 F.3d at 454 (same); *Layman v. Alloway Stamping & Machine Co., Inc.*, 98 Fed. Appx. 369, 375-76 (6th Cir. 2004) (same).  The Sixth Circuit first announced this requirement in 1996 in *Monette*, 90 F.3d at 1178.  It has been expressly upheld repeatedly since then, despite frequent discussion and acknowledgment that the Court in *Monette* imported the 'solely by reason' language from the Rehabilitation Act, where it expressly appears, even though the requirement does <u>not</u> appear in the language of the ADA itself. The majority of

circuits recognize the distinction between the ADA and Rehabilitation Act, and only require disability discrimination to be a 'motivating factor' for the adverse employment action; *i.e.*, they allow what is known as the 'mixed motive analysis.' *Macy*, 484 F.3d at 364 n.2; *McLeod v. Parsons Corp.*, 73 Fed. Appx. 846, 858 (6th Cir. 2003) (unpublished) (noting that courts within the Sixth Circuit are bound by *Monette* standard despite numerous cases from other recognizing "mixed-motive" analysis in ADA cases).

As a result, this phase of the Sixth Circuit's burden-shifting analysis is unique to the ADA and Rehabilitation Act. In the context of other discrimination claims, a plaintiff does not bear the burden of establishing that discrimination was the sole reason for the adverse action against him. *See*, *e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 (1989) (applying mixed motive analysis in Title VII gender discrimination case); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008) (discussing mixed-motive cases in the Title VII context); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003) (recognizing mixed motive analysis in age discrimination cases under the ADEA); *Layman*, 98 Fed. Appx. at 375-76 (noting that mixed motive analysis is appropriate in Title VII cases but not ADA cases); *cf. Dockery v. City of Chattanooga*, 134 F.3d 370, *3 (6th Cir. 1997) (table) (noting that the Sixth Circuit applies the 'solely by reason of' requirement in ADA cases, but applying Title VII mixed-motive analysis to reach the same result to address the plaintiff's mixed-motive arguments). Generally, a plaintiff alleging discrimination need only present evidence giving rise to an inference of discrimination (*e.g.*, temporal proximity between a protected activity and an adverse employment action, statements implying the plaintiff's disability was known to and acknowledged by decision-makers, treatment that differs from that afforded employees who were similarly situated but not in the same protected category, etc.). In no

other context is the burden of showing a sole motive placed upon the plaintiff at the *prima facie* stage.

Finally, as noted above, the burden at the *prima facie* stage is characterized as 'low.'  *Macy*, 484 F.3d at 364 (quoting *Burdine*, 450 U.S. at 253). This tends to blur the line between cases in which the facts are sufficient to satisfy the typical *prima facie* burden and those in which the facts are insufficient to satisfy the burden in an ADA case in the Sixth Circuit.

All of this makes ADA claims in the Sixth Circuit somewhat anomalous and difficult to analyze.  This is perhaps why, in practice, litigants often argue, and courts analyze, the sole motive issue at the later stages of the *McDonnell Douglas* approach rather than the *prima facie* stage.  *See e.g.*, *Macy*, 484 F.3d at 365-66 (noting that the defendant conceded the *prima facie* cases but argued at the subsequent stages of the burden-shifting approach that it had a legitimate reason for firing the plaintiff); *Keith v. Ashland, Inc.*, 205 F.3d 1340, *4 (6th Cir. 2000) (table) (analyzing 'solely by reason of issue' at the second stage of the burden-shifting approach); *cf. Jones v. Potter*, 488 F.3d 397, 403-05 (6th Cir. 2007) (noting in Rehabilitation Act case that the same standard is applicable to ADA and Rehabilitation Act claims but that it would be too onerous to treat the 'solely by reason of' requirement as an element of the *prima facie* case); *Gray v. Champion Intern. Corp.*, 134 F.3d 371, at *3 (6th Cir. 1997) (table) (applying the 'solely by reason of' standard without clearly indicating at which stage of the analysis it operates).

The stage of the *McDonnell Douglas* approach at which the Court chooses to analyze Lane Furniture's motive is not determinative in this case, however.  Even if the Court assumes Seitz has satisfied his *prima facie* case by reference to the temporal proximity between his leave and his reduction in commissions, the failure to adjust his yearly quotas to take account of his leave and

change in his customer base, or to negative comments regarding his "disappearances," he cannot meet his burden with respect to pretext.  Accordingly, the Court will address the question of whether such things provided the "sole" motivation for Seitz's discharge at the later stages of the analysis and impose the burden on that issue upon defendants.

> **ii.    Lane Furniture Has Submitted A Legitimate, Non-Discriminatory Basis for Each of the Adverse Employment Actions**

Proceeding to the next stage of the *McDonnell Douglas* analysis, Lane Furniture submits legitimate, non-discriminatory reasons for changing Seitz's commission and accounts in June of 2005 and for terminating him in January of 2006.  Simply put, Seitz's performance was inadequate.  During Seitz's FMLA leave in March of 2005, Lane Furniture discovered that customers had been dissatisfied with Seitz's service prior to the leave period and that some key customers specifically asked <u>not</u> to deal with Seitz upon his return.  Based on these complaints, it restructured the accounts in the territory and adjusted Garner's commission accordingly.[13]  Customer complaints were also the impetus for Seitz's termination in January of 2006.  Lane Furniture submitted evidence that Seitz was wholly unavailable and unreachable during the week of December 19, 2005 and had not been providing adequate services to his customers.

The fact that Seitz's performance deficiencies may have been caused by his alcoholism does not support a finding of disability discrimination.  It is well-established that the ADA does not protect a disabled employee from adverse employment actions resulting from misconduct allegedly

---

[13]  As noted, the customer-base reassignment did not affect Seitz's ability to receive commissions, since commissions from all customers in the territory were shared.  Only the revision to his commission percentage would have had the potential to reduce his income.  Because Seitz's own sales were low before the change, moreover, it is unclear whether the overall increase in productivity after the change might have offset the effect of the decrease in Seitz's percentage share of commissions.  The record is simply unclear on this point.

caused by his disability.  *See*, *e.g.*, *Maddox  v. University of Tennessee*, 62 F.3d 843, 847 (6th Cir.

1995).   In *Maddox,* the most frequently cited Sixth Circuit case on this point, the University of

Tennessee fired an assistant football coach after he was arrested for driving under the influence of

alcohol.  149 F.3d at 846.  The coach sued under the ADA, arguing that driving under the influence

was a manifestation of his disability (*i.e.* alcoholism), and, therefore, "causally connected."  *Id*.  The

Sixth Circuit expressly rejected this reasoning, noting that "the ADA specifically provides that an

employer may hold an alcoholic employee to the same performance and behavior standards to which

the employer holds other employees 'even if any unsatisfactory performance is related to the

alcoholism of such employee.'" *Id*. (quoting 42 U.S.C. § 12114(c)(4)).  The Sixth Circuit explained

its rationale for this rule as follows:

> We . . . hold that the district court correctly focused on the distinction between
> discharging someone for unacceptable misconduct and discharging someone because
> of the disability.  As the district court noted, to hold otherwise, an employer would
> be forced to accommodate all behavior of an alcoholic which could in any way be
> related to the alcoholic's use of intoxicating beverages; behavior that would be
> intolerable if engaged in by a sober employee or, for that matter, an intoxicated but
> non-alcoholic employee.

62 F.3d at 847.  Numerous subsequent Sixth Circuit decisions have expressly followed *Maddox*.

*See e.g.*, *Martin*, 209 F.3d at 934-35 (following *Maddox* and holding that a school district clearly

presented a legitimate, non-discriminatory basis for terminating a bus driver suffering from

alcoholism for drinking on the job); *Keith*, 205 F.3d 1340, at *4 (granting summary judgment and

noting that ADA does not protect alcoholic from the consequences of his actions); *Livingston v. U.S.*

*Postal Serv.*, 168 F.3d 490, *6 (6th Cir. 1998) (table); *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180,

1183 (6th Cir. 1997) (applying *Maddox* distinction where employee was terminated for reporting to

work intoxicated); *Walker v. Consol. Biscuit Co.*, 116 F.3d 1481, at *3 (6th Cir. 1997) (table) (same).

The *Maddox* distinction applies equally to other disabilities.  In *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 521 (6th Cir. 1998) the Sixth Circuit discussed and applied the distinction in a case involving an anesthesiologist suffering from chronic sleep deprivation as a result of sleep apnea:

> Brohm argues that the facts in *Maddox* are distinguishable from the present case because driving while intoxicated, the conduct addressed in *Maddox*, is not an inevitable consequence of alcoholism.  In other words, an alcoholic's compulsion to drink alcohol does not also compel him to drive while intoxicated.  The facts of the present case, however, are not so different in that respect.  One suffering from chronic sleep deprivation may well be so tired that he cannot stay awake.  But such sleep deprivation did not compel Brohm to administer anesthetics during surgical procedures when he knew he was tired.

*Id*. at 521-22. *See also Macy*, 484 F.3d at 366 (applying the *Maddox* distinction where employee's objectionable conduct was caused by post-concussive syndrome); *Gray v. Champion Intern. Corp.*, 134 F.3d 371, at *3 (6th Cir. 1997) (table).  Accordingly, even if the *conduct* on which Lane Furniture based its adverse employment decisions was caused by Seitz's disabilities, either alcoholism or depression, the decisions do not run afoul of the ADA.  *See*, *e.g.*, *Dockery*, 134 F.3d at *3 (table) (citing *Maddox* where depression was the alleged disability); *Matuska v. Hinckley Twp.*, 56 F. Supp. 2d 906, 918 (N.D. Ohio 1999) (same).  The Court finds that Lane Furniture has provided a legitimate, non-discriminatory reason for the adverse employment actions at issue.

### iii.    Pretext

Because Lane Furniture has provided legitimate, non-discriminatory reasons for its adverse employment actions, the burden shifts back to Seitz to show that Lane Furniture's reasons are actually a pretext for unlawful discrimination.   To establish pretext, Seitz must demonstrate that Lane Furniture's reasons for the adverse employment actions:  (1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to motivate the action.  *See Manzer v. Diamond Shamrock*, 29 F.3d 1078, 1084 (6th Cir. 1994).  Using one or more of these three methods, Seitz must

establish pretext by a preponderance of the evidence.  *Id*.  "[T]he ultimate burden of proving that the

employer discriminated against the employee on account of his or her disability remains at all times

with the employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805 (6th Cir. 1998) (citing *Monette*, 90

F.3d at 1186-87).

In addition, <u>each</u> of the employer's reasons, if sufficient to justify the adverse employment

action, must be pretextual.  "In challenging an employer's action, an employee 'must demonstrate

that the employer's reasons (*each of them*, if the reasons independently caused [the] employer to take

the action it did) are not true.'" *Smith*, 155 F.3d at (quoting *Kariotis v. Navistar Int'l Trans. Corp.*,

131 F.3d 672, 676 (7th Cir.1997) (emphasis added)).  This is inherent in the Sixth Circuit rule

against recovery in mixed-motive cases under the ADA.  *See Macy*, 484 F.3d at 364 n.2; *Brohm*, 149

F.3d at 520-21; *Hedrick*, 355 F.3d at 454.  Similarly, even when the employer's explanation is

legally defective, the plaintiff must establish that the employer's action was discriminatory.  *See*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).  In *Reeves*, the Supreme

Court stated:

> For instance, an employer would be entitled to judgment as a matter of law if the
> record conclusively revealed some other, nondiscriminatory reason for the
> employer's decision, or if the plaintiff created only a weak issue of fact as to whether
> the employer's reason was untrue and there was abundant and uncontroverted
> independent evidence that no discrimination had occurred.

*Id*.

In this case, Seitz cannot establish pretext, under any of the methods, because the evidence

in support of at least one of Lane furniture's reasons for taking adverse employment actions –

customer complaints regarding deficient performance -- is overwhelming, and essentially unrebutted.

 *Smith*, 155 F.3d at 805; *Reeves*, 530 U.S. at 148.  Lane Furniture has presented ample evidence of

-28-

customer complaints, in connection with both the restructuring of Seitz's job responsibilities in June

of 2005 and his termination in January of 2006.

First, Lane Furniture has submitted ample evidence from several different sources

demonstrating that Seitz's customers complained about inadequate service prior to his taking FMLA

leave in 2005.  At his deposition, Sam Wise testified that, in the process of servicing Seitz's accounts

while he was on FMLA leave, he and Garner found significant problems related to inadequate

service at Seitz's largest accounts.  (*Wise Dep.* 66-68.)[14]  The declarations from the owners of

---

[14]  Wise testified that he told Seitz about problems he and Garner had discovered at Seitz's accounts
when the two met prior to Seitz's return from FMLA leave.

> Mike and I sat down.  I told Mike that I wanted to talk about his top three accounts,
> the accounts that he was doing the most business with.  And I started off with
> Sheely's, which is in North Lime, Ohio.
> And I told Mike that we had found problems that went back six months, at least,
> maybe longer of pricing that hadn't been addressed. . . .
> We found merchandise that hadn't been inspected.  We found mechanisms that
> weren't sent.  We found swatches that were outdated.  Numerous things that we had
> problems with.  And Mike was basically denying all of it.  And then I told Mike that
> I had talked to Marge Slavoc . . . who is the buyer at Sheely's.
> And that she had told me about an incident that happened before Mike was on leave.
> That he had said something very inappropriate to some female sales associates. . . .
> And I told Mike, I said, "Mike, we have got the same problems with Wayside,"
> which is in Akron, Ohio. And I said, "I talked to . . . the sales manager . . . . [H]e had
> problems going back six months on pricing, on merchandise that hadn't been
> inspected, on swatches.  Just things that hadn't been handled right.  And then we
> addressed Andreas, which is his third largest account.  And I told him that Dan Hicks
> had problems.  Mike said, you know, "Dan's my friend."  And I said, "He's still your
> friend, Mike."
> He's – but I said, "The people at Sheely's, they don't want you back in their store.
> Marge Slovac has told me that the owners, who are Sherry and Dale Sheely, do not
> want you back in their store."  And I said, "The same goes for Wayside.  And I was
> told . . . that they didn't want you back in the store.
> And the owner . . . wanted Jason [Garner] to call on him.  That they just had so many
> problems that they just couldn't – they couldn't continue to do business with us if
> Mike was going to service the account.

(*Wise Dep.* 66-69.)

-29-

Sheely's Furniture and Connell's Furniture expressly corroborate Wise's testimony that Sheely's and Connell's asked Lane Furniture to have Garner service their accounts.  (*See Sheely Decl.*; *Connell Decl.*)

Although Seitz argues that he was only aware of the complaint lodged by Sheely's Furniture, in the summer of 2005, and denies the substance of the complaint, his subjective awareness is irrelevant.  Lane Furniture was not obliged to inform Seitz of any and all customer complaints; it is undisputed that customers communicated their complaints to Garner or Sam Wise directly in the spring of 2005 while Seitz was on FMLA leave.  *See Abdulnour v. Campbell Soup Supply Co., LLC*, 464 F. Supp. 2d 711, 716-17 (N.D. Ohio 2006) (finding employees lack of knowledge of complaints inconclusive).  There is nothing improper about this, as Lane Furniture had to continue to service Seitz's accounts in his absence, and, in the natural course of doing so, learned about problems with several of his largest accounts.  As Lane Furniture points out, when the largest customer in Seitz's territory – Sheely's Furniture – requests a new sales representative, the company gives them a new representative as a simple matter of good business practices.  In fact, Sam Wise had already explicitly emphasized the importance of service at the five largest accounts in the territory in a letter to Seitz in January of 2005.  (Doc. 36-7, *Pl. Br. Partial Summ. J.*, Ex. E.)[15]  Ms. Sheely's affidavit

---

[15]   The letter states, in part, as follows:

> In order to insure that you make quota in every category and that your shipments are ahead with every account, we need to concentrate on our **top five accounts** in each territory and the accounts that finished down in shipments in 2004.  . . .  Your feedback to me concerning these accounts will be critical in assuring that they finish ahead in 2005.  We will have to react early at the slightest problem with these accounts . . . .

(*Pl. Br. Partial Summ. J.*, Ex. E. (emphasis in original).)

-30-

makes it clear that Sheely's Furniture – Seitz's largest account -- was unhappy with Seitz's performance prior to his 2005 FMLA leave, and specifically asked Lane Furniture to reassign Garner to their account.

Seitz submits that Sam Wise told him the actual motivation for demoting him in June of 2005 was an effort "to reduce stress and anxiety."  Although this may be some, albeit limited, evidence of pretext, reducing his stress and anxiety was only one of the bases for restructuring Seitz's job responsibilities and commissions.  To establish pretext, the Sixth Circuit requires the employee to demonstrate that *each* of the employer's reasons for taking the adverse employment action are pretextual.  *Smith*, 155 F.3d at 806.  As discussed above, the Sixth Circuit does not permit an ADA plaintiff to recover in mixed-motive cases.  *See*, *e.g.*, *Hedrick*, 355 F.3d at 454.  Even if Wise's remark were enough to create a material issue of fact with respect to whether demoting Seitz to relieve his stress and anxiety was a pretext for unlawful discrimination (which, as noted below, the Court finds it is not), it does not undermine the credibility of Lane Furniture's representation that Seitz was demoted due to customer complaints, especially in light of the specific and unequivocal complaint of the biggest customer in his territory, which is independently verified by the customer declaration.  Therefore, Sam Wise's remark is insufficient to establish pretext.

Likewise, there is no genuine issue of material fact that Seitz's termination in January of 2006 was also based on performance issues.  Lane Furniture submitted deposition testimony, emails and telephone records clearly indicating that Seitz was unavailable professionally during the week of December 19, 2005, just one week after he was placed on probation.  In addition, the same evidence establishes that multiple customers were dissatisfied with the service Seitz was providing on behalf of Lane Furniture.  (*See e.g.*, *Def. Br. Summ. J.*, Ex. 22.)  The deposition testimony of Greg

Roy summarizes Lane Furniture's position with respect to Seitz's performance just prior to his termination:

> Q.  So as of December 24th you had decided you were terminating Mike Seitz?
> A.  After a week of being unable to be reached, technically the salesman's contract says you shouldn't be out of your territory for more than two days without notifying your manager.  So that was a breach of contract.
> Q.  So you had decided you were going to terminate him on breach of contract?
> A.  This was the final straw.  It was all based on his performance.  But when he was out of the territory and we were getting complaints and no one could reach him, that was it.
> Q.  Well, and that was in fact in response to a representation to you by Jon Drosnock that they had sent him a fax and an e-mail?
> A.  Right.  I went to HR and said we can't find Mike Seitz who's on probation.  No one can reach him.  How should we proceed?  And I was told to send a certified mail.
> Q.  So as of that date you believe that Mike Seitz was in breach of his contract?
> A.  At that date I had decided that enough was enough.
> Q.  And because you had decided he was in breach of his contract?
> A.  Well, that contributed to it, that he was out of his territory.  That wasn't the sole reason.  The biggest reason, again, was his performance, it was strictly performance.

(*Roy Dep.* 100-01.)  Lane Furniture also submits phone records indicating that Seitz did not use his cell phone to call his customers during the week of December 19, 2005.  (*Def. Br. Summ. J.*, Ex. 9.)  Finally, his medical records, his own deposition testimony, and the deposition testimony of his doctor, Dr. Reeves, indicate that he was drinking heavily throughout the week of December 19th,

until he checked himself into the hospital on December 25, 2005.[16]  (*See*  Doc. 35-13, *2005 Medical Records*,; *Seitz Dep.* 100; *Reeves Dep.* 33-35.)[17]

       For his part, at his deposition, Seitz generally denied that he was unavailable, denied that his cell phone voicemail was full and did not recall that Drosnock had sent him a fax.  He vaguely recalled making sales calls at various times in December, though he could not recall when or where, and said that he had no knowledge of customer complaints.  Construed appropriately for summary judgment purposes, this evidence does not call into question the factual basis of Lane Furniture's stated reason for terminating Seitz.  His general denial that he was unavailable and belief that he had made sales calls in December is insufficient to create a genuine issue with respect to pretext.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (stating "rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as

---

[16]  Dr. Reeves first testified at his deposition that Seitz told him he had started drinking about 48 hours before December 24, 2005, which was a Saturday.  (*Reeves Dep.* 33.)  Later in his deposition, when shown the medical report he prepared when Seitz was admitted to the hospital on December 25, 2005, Dr. Reeves confirmed the accuracy of the records, which state that Seitz reported that "he ha[d] been drinking an average of 30 beers per day" for the previous six days.  (*Id.* 34-35; *2005 Medical Records*, Doc. 37-13.)  Dr. Reeves also said that Seitz had called him just before his deposition and supplied the 48-hour time frame to which he just testified.

[17]  Lane Furniture submits that the medical records establish that Seitz was drinking on the job during the week of December 19, and, consequently, could have been terminated for violating the terms of his employment agreement.  (*Def. Br. Summ. J.* 21-22; *Roy Decl.* 35-11.)  Lane Furniture admits that it did not learn of this basis for termination until the discovery process in this litigation and it is therefore after-acquired evidence that can not serve as a legitimate non-discriminatory reason for purposes of the *McDonnell Douglas* analysis.  Lane Furniture argues, however, that after-acquired evidence can limit Seitz's recovery.  *See McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362-63 (1995).  Lane Furniture acquired the medical records establishing that Seitz drank on the job in December of 2005.  Therefore, if the after-acquired evidence rule applies, Seitz could only recover front pay from the date of his termination to July, 2007, and is not entitled to reinstatement.  In response, Seitz argues that courts within the Sixth Circuit have consistently declined to apply the after-acquired evidence rule at the summary judgment stage.  (*Pl. Resp. Br. Opp'n* 28-29.)  Because it finds that Lane Furniture's motion for summary judgment is well-taken, the Court need not rule on the issue of after-acquired evidence.

-33-

a matter of law").  Furthermore, as stated above, the fact that Seitz was not aware of customer complaints does not mean that customers were not complaining, and there is ample evidence that they were.  *Abdulnour*, 464 F. Supp. 2d at 716-17.

Likewise, Seitz cannot establish pretext by arguing that he was fired because Lane Furniture failed to adjust his sales quotas in light of his FMLA leave and the transfer of the most lucrative accounts to Garner.[18]  In addition to the service-related complaints from customers prior to his 2005 FMLA leave, Lane Furniture continued to field complaints from customers in the late-Fall of 2005.  Lane Furniture submits evidence that the company considered service-related issues prior to placing Seitz on probation in December of 2005.  For example, Greg Roy testified as follows at his deposition:

> Q.    Tell me about the service-related issues that surfaced?
> A.    Jon Drosnock notified me that he had received phone calls and complaints from customers in Mike Seitz's territory.  And that, you know, that bothered him that there were some service that was not being taken care of in the field which is a big part of the representative's job.  And as I recall, Jason Garner ended up doing some background checking with customers and found that to be true.
> Q.    How many client calls did Jon Drosnock get?
> A.    I don't know the exact number, it was at least two.
> . . .
> Q.    Do you know when they were received?
> A.    They were received after mid November.  Would have been either later November or early December.
> Q.    So before the probationary period was communicated to Michael Seitz?
> A.    Yes.

---

[18]  Lane Furniture does not dispute that it failed to properly adjust Seitz's quotas.  (*See Def. Reply Summ. J.* 8.)  Instead, it argues that it "terminated [Seitz] because of well documented customer service issues and because of its honest belief that [Seitz's] sales performance was inadequate."  (*Id.* (citing *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).)  See below for further discussion of the "honest belief" rule.

-34-

(*Roy Dep.* 52-53.)  In addition, when Jason Garner called Seitz's accounts at the end of December, 2005, he discovered that at least two customers – Watson's 87 and Sedlak Interiors – were considering replacing Lane Furniture with another supplier in light of the poor service they had been receiving.  (*Def. Br. Summ. J.*, Ex. 23.)  This evidence, which is unrebutted by Seitz, demonstrates that sales quotas alone did not motivate the decision to put him on probation, and, as discussed above, his termination was not based solely on his failure to meet sales quotas either.[19]  Moreover, Greg Roy testified that he made the decision to terminate Seitz *before* he reviewed his sales quotas numbers for the probationary period.  (*Roy Dep.* 80.)  Therefore, Seitz's termination could not have been based on his failure to meet his quotas, whether they were fair or not.[20]  Lastly, the fact that Seitz was terminated before the end of his probationary period actually suggests that service-related issues (as distinct from quotas) were, in fact, the basis of his termination because the company could no longer afford to allow Seitz to alienate its customers.[21]  (*Id.* 100-01.)

---

[19]  More accurately, it appears that review of sales quotas motivated Lane Furniture to monitor Seitz's accounts, and, as a result discover that some of his customers were dissatisfied.  Seitz cannot legitimately claim that his employer should not have monitored his performance, even if the level of scrutiny was based on a misleading record of his sales.  This principle is inherent in the requirement that the plaintiff ultimately demonstrate that the employer's action was discriminatory.  *See Reeves*, 530 U.S. at 148.

[20]  While Seitz complains here about the failure to adjust his sales quotas, he presented no evidence indicating that he ever raised this issue with Lane Furniture or requested the very adjustment he now says should have occurred.

[21]  Seitz argues that this case is analogous to *Higgins v. Office Depot, Inc.*, 2007 WL 184753 (W.D. Okla. Jan. 19, 2007).  In *Higgins*, a salesman was terminated after he failed to meet his annual sales quotas in a year that he took FMLA leave.  But for his FMLA leave, the salesman would have met his annual quotas, and the employer failed to pro-rate his quotas in light of the FMLA leave.  The court found this to be sufficient evidence of pretext to survive summary judgment.  *Id.* at *6.  *Higgins* is readily distinguishable from this case, however, because it did not involve customer complaints.  The sole basis of termination in *Higgins* was failure to meet sales quotas.

For all of the foregoing reasons, no genuine issue of material fact exists with respect to Seitz's disability discrimination claims.[22] Lane Furniture's motion for summary judgment with respect to such claims is therefore **GRANTED**.

### 2.    FMLA Claims

In Count Three of the *Complaint*, Seitz alleges that (1) Lane Furniture violated the Family Medical Leave Act ("FMLA") by failing to reinstate him to a substantially similar position after returning from FMLA-protected leave and; (2) he was terminated at least in part because he exercised his right to FMLA leave. The parties, and Sixth Circuit law, recognize each allegation as a distinct claim – the first is an "entitlement/interference" claim arising under 29 U.S.C. § 2615(a)(1) and the second is a "retaliation/discrimination" claim arising under 29 U.S.C. § 2615(a)(2).[23] *See Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 243 (6th Cir. 2004). The entitlement claim relates to Seitz's return from FMLA leave in June of 2005, when Lane Furniture promoted Garner

---

[22]   Lane Furniture also cites the Sixth Circuit's "honest belief" rule as an alternative ground in arguing that Seitz cannot establish pretext based on Lane Furniture's failure to adjust his quotas. Under the honest belief rule, a finding of pretext is not warranted when the employer demonstrates an honest belief in its proffered reason for the adverse employment action. *See Smith*, 155 F.3d at 806. Though it may be possible for Lane Furniture to prevail under the honest belief rule, the Court need not analyze or decide that question given its finding that Lane Furniture's performance-based reason for its adverse employment decisions is not pretextual.

[23]   Section 2615(a) of the FMLA provides:

(a) Interference with rights
  (1) Exercise of rights
      It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.
  (2) Discrimination
      It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

to full partner – thus reducing Seitz's commission from 65 percent of sales in the territory to 50 percent – and transferred most of the large accounts in the territory from Seitz to Garner.  The retaliation claim relates to Seitz's termination in January of 2006.

### i.      Seitz's FMLA Entitlement Claim[24]

The purpose of the Family Medical Leave Act ("FMLA") is to prevent an employee from losing his job because he has to take time off work in the event that the employee or an immediate family member is afflicted with a serious health condition.  29 U.S.C. §§ 2601.  Under the FMLA, an eligible employee is entitled to take up to twelve weeks of unpaid leave during any twelve month

---

[24]  Seitz's motion for partial summary judgment (Doc. 36) only relates to his FMLA entitlement claim under § 2615(a)(1).  Explaining the scope of his motion for partial summary judgment, Seitz specifically states:

> While Plaintiff believes that the balance of the FMLA issues as well as the issue pertaining to his claim of disability discrimination under state and federal law are replete with factual issues, there is no issue of fact as it pertains to the Defendants [sic] failure to comply with the reinstatement obligations imposed by the Family Medical Leave Act.

(*Pl Mt. Partial Summ. J.* 1.)  In his motion, Seitz argues that there is no genuine issue of material fact and he is entitled to judgment as a matter of law with respect to his claim that Lane Furniture failed to reinstate him as required by the FMLA upon his return from FMLA leave in June of 2005.  Lane Furniture's motion for summary judgment relates to all of Seitz's claims.  Therefore, cross-motions for summary judgment are now pending with respect to Seitz's FMLA entitlement claim.  To prevail on his motion for partial summary judgment, Seitz must establish that no reasonable jury could conclude that Lane Furniture would have reduced his commissions and transferred accounts for reasons other than his decision to take FMLA leave.  To prevail on its motion for summary judgment with respect to Seitz's FMLA entitlement claim, Lane Furniture must establish that no reasonable jury could conclude that it reduced Seitz's commissions and transferred accounts because he took FMLA leave.

period to attend to a serious health condition.  29 U.S.C. §§ 2601 and 2612(a)(1)(D).[25]  An employee

who exercises his or her right to FMLA leave is entitled to reinstatement, as described in § 2614(a)

of the FMLA.  *See also*, *Moorer*, 398 F.3d at 486.  Section 2614(a) describes both the entitlement

to reinstatement, and the limitations on that right:

> (a) Restoration to position
>
> > (1) In general
> >
> > Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave--
> >
> > > (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or
> > >
> > > (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.
> >
> > (2) Loss of benefits
> >
> > The taking of leave under section 2612 of this title shall not result in the loss of any employment benefit accrued prior to the date on which the leave commenced.
> >
> > (3) Limitations

---

[25] Section 2612(a)(1)(D) provides:

> (a) In general
> > (1) Entitlement to leave
> > > Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
> > . . .
> > > (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

> Nothing in this section shall be construed to entitle any restored employee to--
>
> > (A) the accrual of any seniority or employment benefits during any period of leave; or
> >
> > (B) any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave.

29 U.S.C. § 2614(a).

### a.    Elements of Seitz's FMLA Reinstatement Claim

Accordingly, Seitz must satisfy five elements to prevail on his FMLA entitlement claim.  He must establish that: (1) he was an eligible employee; (2) Lane Furniture is an employer for purposes of the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave the employer notice of his intent to take leave; and (5) Lane Furniture interfered with FMLA rights to which he was entitled. *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008); *Hoge*, 384 F.3d at 243.  The first four elements are undisputed – *i.e.*, that Seitz was (1) an eligible employee of a (2) covered employer (3) who was entitled to take FMLA leave and (4) gave Lane Furniture notice of his intent to take leave.  The issue is whether Lane Furniture interfered with Seitz's right to reinstatement under the FMLA in connection with his return to work after taking FMLA leave from March through June 13, 2005.

An employer's failure to reinstate the employee as required by § 2614(a) is a violation of the FMLA.  *Moorer*, 398 F.3d at 487.  "Because the issue is the right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Id.* (citing *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159 (1st Cir. 1998)).  In addition, the regulations promulgated under the FMLA provide that reinstatement means the employee is entitled "to be returned to the same position the employee held when leave commenced, or to an equivalent

-39-

position with equivalent benefits, pay, and other terms and conditions of employment." 29 C.F.R.

§ 825.214(a).

Section 2614(a)(3)(B) limits the right to reinstatement, however, and the regulations provide

that "an employee has no greater right to reinstatement or to other benefits and conditions of

employment than if the employee had been continuously employed during the FMLA leave period."

29 C.F.R. § 825.216(a).  As stated in *Moorer*, 398 F.3d at 488-89:

> "'[A]n employee who requests FMLA leave would have no greater protection against
> his or her employment being terminated for reasons not related to his or her FMLA
> request than he or she did before submitting that request.' " *Arban* [*v. West Publ'g
> Corp.*], 345 F.3d [390,] 401 (quoting *Gunnell v. Utah Valley State Coll.*, 152 F.3d
> 1253, 1262 (10th Cir.1998)). "An employee lawfully may be dismissed, preventing
> him from exercising his statutory rights to FMLA leave or reinstatement, but only if
> the dismissal would have occurred regardless of the employee's request for or taking
> of FMLA leave." *Id.* (citing *Gunnell*, *supra* ). Thus, " 'if the employer claims that the
> employee would have been discharged ... the employee, in order to establish the
> entitlement protected by § 2614(a)(1), must, in the course of establishing the right,
> convince the trier of fact that the contrary evidence submitted by the employer is
> insufficient and that the employee would not have been discharged ... if he had not
> taken FMLA leave.' " *Id.* (quoting *Rice* [*v. Sunrise Express*, 209 F.3d 1008, 1018
> (7th Cir.2000)], *supra* ).

The Sixth Circuit in *Moorer* speaks in terms of termination, but the same limitations are applicable

to reinstatement under § 2614(a)(1): Seitz must demonstrate that Lane Furniture would not have

restructured his job responsibilities and commissions but for the fact that Seitz took FMLA leave in

March of 2005, "or at least that his taking of leave was a 'negative factor' in [Lane Furniture]'s

[adverse employment actions]."  *Pharakhone v. Nisson N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir.

2003) (citing *Kohls v. Beverly Enters. Wisconsin, Inc.*, 259 F.3d 799, 804 (7th Cir. 2001)).  As the

Sixth Circuit recently stated "interference with an employee's FMLA rights does not constitute a

violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for

engaging in the challenged conduct."  *Grace*, 521 F.3d at 670 (quoting *Edgar v. JAC Prods.*, 443

-40-

F.3d 501, 507 (6th Cir. 2006)).  In fact, as described in *Grace*, when a defendant in an FMLA

entitlement case defends by proffering a legitimate, non-discriminatory reason unrelated to the

FMLA right at issue, the Sixth Circuit applies the test for pretext from the *McDonnell Douglas*

burden-shifting approach.  *Id*.

> If the defendant proffers such a justification, then the plaintiff may seek to rebut it by
> a preponderance of the evidence. *See Arban*, 345 F.3d at 401. Specifically, a plaintiff
> can "refute the legitimate, nondiscriminatory reason that an employer offers to justify
> an adverse employment action 'by showing that the proffered reason (1) has no basis
> in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was
> insufficient to warrant the challenged conduct.' " *Wexler v. White's Fine Furniture*,
> 317 F.3d 564, 576 (6th Cir.2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016,
> 1021 (6th Cir.2000)).

*Id*.

### b.    Analysis of Seitz's FMLA Entitlement Claim

Seitz argues that Lane Furniture violated the FMLA's reinstatement requirement in three

respects: (1) by reducing his compensation upon his return from FMLA leave on June 13, 2005; (2)

by transferring the largest accounts in the territory to Garner and thus altering his level of

responsibility and status; and (3) by failing to pro-rate his sales quotas in light of his FMLA leave

and thus subjecting him to a higher performance standard than other sales representatives.[26]  For the

most part, the Court has already addressed these arguments in the context of Seitz's disability

discrimination claims.  Because this is a separate claim under different law, however, the Court will

briefly address Seitz's arguments here as well.  Each of Seitz's arguments in support of his FMLA

---

[26]  Seitz offers very little explanation of the basis of these grounds in his motion for partial summary
judgment. (Doc. 36.) He essentially advances a strict liability theory, arguing that, if Lane Furniture
failed to reinstate Seitz after his FMLA leave, its intent in doing so is irrelevant.  As noted above,
this is an accurate, but incomplete, statement of the law – Seitz can not prevail if Lane Furniture
would have changed Seitz's commission and status regardless of his taking FMLA leave.  In fact,
in *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507-08 (6th Cir. 2006), the Sixth Circuit noted that the
strict liability theory has been expressly rejected.

entitlement claim fails to raise a genuine issue of material fact sufficient to survive Lane Furniture's motion for summary judgment.  None of the arguments refutes Lane Furniture's defense that it would have taken the adverse employment actions in question regardless of Seitz's FMLA leave, or demonstrates that his FMLA leave was a negative factor in the adverse employment decisions.  *See Grace*, 521 F.3d at 670.

Lane Furniture's defense falls squarely into the category described above in *Grace* in which the court held that the FMLA does not prohibit an employer from taking an adverse employment action in response to conduct discovered during or prior to the protected leave period.  According to Lane Furniture, it would have redistributed commissions in Seitz's territory and transferred the accounts regardless of Seitz's FMLA leave.  It transferred the accounts because of customer complaints about Seitz's performance prior to his FMLA leave, including specific customer requests to replace Seitz with Garner.  It adjusted commissions based on a long-standing and well-known plan to ultimately promote Garner to full partnership and in light of Garner's continued development as a sales representative and assumption of responsibility for most of the large accounts in the territory.[27]  Furthermore, assuming that Lane Furniture failed to modify his quotas, this occurred only as a result of the permissible transfer of accounts and was not causally related to Seitz's exercise of FMLA entitlements.  *See Edgar*, 443 F.3d at 508 ("Employees seeking relief under the entitlement

_____

[27]  In fact, Wise testified that the common understanding was that Garner would eventually be promoted to full partner alongside Seitz.  (*Wise Dep.* 70-71 ("And I said [to Seitz], 'All along, . . . when Jason [Garner] came into to your territory as a partner, you agreed, I agreed, Jason agreed that eventually it was going to be a 50/50 split.").)  Although Seitz says he did not want Garner to become a full partner in 2005, he does not claim that he was unaware of the company's plan to eventually make Garner a full partner in his territory.

theory must therefore establish that the employer's violation caused the harm.")[28]  Therefore, Lane Furniture argues, Seitz's FMLA entitlement claim fails because the adverse employment actions would have occurred regardless of Seitz's FMLA leave.

Lane Furniture's argument is properly supported by citation to numerous cases in which the court found that the FMLA does not prohibit an employer from taking adverse employment actions based on the intervening events and newly discovered facts during the period of the plaintiff's FMLA leave. (*See Def. Resp. Br. Opp'n* 3-4.)  For example, Lane Furniture cites *Stefanski v. W.W. Grainger, Inc.*, 155 Fed. Appx. 177 (6th Cir. 2005) (unpublished).  In *Stefanski*, the plaintiff/sales representative took FMLA leave related to depression.  While he was away, the employer fielded complaints from several of the plaintiff's accounts.  In response, the employer transferred these particular accounts when the plaintiff returned from his leave.  The Sixth Circuit affirmed summary judgment in favor of the employer on the grounds that the plaintiff could not establish pretext in light of the documented customer complaints.[29]  *Id.* at 181-82.  *See also Pharakhone v. Nisson N. Am.,*

---

[28]  While Seitz repeatedly returns to the issue of his quotas, and to their fairness, as noted above, he presents no evidence that he ever asked that his quotas be adjusted or even complained to anyone at Lane Furniture about their continuing viability once his accounts were restructured or his leave was approved.  There is, thus, no evidence that Lane Furniture was even aware of this issue and certainly no evidence of a conscious decision to punish Seitz.  On the record presented, the absence of any adjustment to his quotas is as likely an oversight as it is an affirmative adverse action against him.

[29]  Seitz argues that *Stefanski* is distinguishable because the only accounts the employer in *Stefanski* transferred were those from which the employer received and documented complaints.  155 Fed. Appx. at 181-82.  He notes that Lane Furniture transferred almost all of Seitz's accounts, and contends that Lane Furniture did not adequately document the customer complaints or submit sufficient evidence of customer complaints.  For the reasons discussed above, the Court finds that Lane Furniture was operating within the permissible confines of its business judgment when it chose to re-assign Seitz's accounts based on complaints from some, but not all, of his customers and that Lane Furniture has submitted ample evidence of those complaints, including the declarations of two customers.

-43-

*Inc.*, 324 F.3d 405, 408 (6th Cir. 2003) (affirming summary judgment in favor of employer where employee was fired for violating company rules while on FMLA leave); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (affirming summary judgment in favor of employer when company discovered employee's significant performance deficiencies in the course of covering her job responsibilities during her FMLA leave period); *Stanley v. Volvo Parts N. Am.*, 2008 WL 2473658, at *5 (S.D. Ohio Jun. 17, 2008) (citing *Pharakhone* with approval)*; Hollins v. Ohio Bell Tel. Co.*, 496 F. Supp. 2d 864, 872-73 (S.D. Ohio 2007) (granting employer's motion for summary judgment finding that employee was discharged for excessive absenteeism interspersed with periods of approved FMLA leave as opposed to absences due to FMLA leave); *Banks v. Dow Chem. Comp.*, 2006 U.S. Dist. LEXIS 2818, at *53 (E.D. Mich. 2006) (granting employers motion for summary judgment where plaintiff was discharged for poor performance prior to taking FMLA leave). Accordingly, Seitz's FMLA entitlement claim fails for the reasons discussed in the above analysis of pretext in the context of Seitz's disability discrimination claims.

As discussed at length above, Lane Furniture has submitted ample evidence from several different sources demonstrating that Seitz's customers complained about inadequate service prior to his taking FMLA leave in 2005. With the exception of the complaint regarding the remark made at Sheely's, Seitz disputes that Wise told him about customer complaints, and he denies that he made an inappropriate remark at Sheely's. (*Seitz 2d Decl.* ¶¶ 33-35.) He also submits that statistically, his accounts were performing well during the first several months of 2005. (*Id.* ¶ 21.) Taking the facts in the light most favorable to Seitz, the Court can assume that (1) Wise did not tell Seitz about customer complaints and (2) his accounts were performing adequately in early 2005. These facts do not negate the significant evidence Lane Furniture has submitted regarding customer complaints,

however.  As noted above, the fact that Wise did not inform Seitz of customer complaints (if that is true) does not mean that they did not exist, and Lane Furniture submits the declarations of Sherry Sheely and Ed Connell to independently confirm Wise's description of the customer complaints he received.  Similarly, the fact that Seitz's sales numbers were adequate in early 2005 does not refute the legitimacy of the *service*-related customer complaints Lane Furniture received, especially given the Sheely declaration detailing the reasons that Sheely's, Lane Furniture's largest customer in the territory, was deeply dissatisfied with Seitz's performance and did not want him in their store. Indeed, it is undisputed that Lane Furniture faced loss of the Sheely's account if it did not remove Seitz from that customer; whatever the numbers for that account before the 2005 complaints, accordingly, it would not have generated *any* income for Lane Furniture in the absence of the restructuring.  It is well-established that the Court may not second-guess the business judgment of a company's personnel decisions, unless the decisions are discriminatory.  *See Hedrick*, 355 F.3d at 462 (citing numerous cases noting that the "it is inappropriate for the judiciary to substitute its judgment for that of management").

The rule against second-guessing business decisions is also applicable to Seitz's second argument, *i.e.*, that Lane Furniture's decision to reduce his commission and transfer his accounts was an unreasonably harsh response to customer complaints.  He argues that Sheely's and Connell's are the only documented complaints, and Connell's was a small account.  Again, even assuming that Seitz is correct, he concedes that customers – including the biggest customer in the territory, Sheely's – did complain.  He has thus admitted that the proffered non-discriminatory reason is based in fact, and, because the Court may not second-guess Lane Furniture's business judgment, he can not argue that a decision to restructure the status and accounts in the territory based on the largest customer's

request to have Garner assigned as its sales representative was unwarranted.  Lastly, for the same reasons discussed above with respect to the disability discrimination claims, Seitz has not demonstrated that the restructuring was more likely motivated by an illegal reason than because of customer complaints.  *See Manzer*, 29 F.3d at 1084 (stating that under this method "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employers explanation is a pretext, a cover-up").

Seitz's testimony that Sam Wise told him that his responsibilities were being restructured "in order to reduce his stress and anxiety" is probably his best argument that FMLA leave was a negative factor in Lane Furniture's decision.  When the remark is viewed in context, however, there is no indication of a relationship between the remark and Seitz's FMLA leave, as opposed to the long-standing recognition that his territory was large, that Garner would eventually become a full partner, and that, prior to taking leave, his behavior was erratic.  This is especially true when the entire history of Seitz's relationship with Wise is taken into account – a history that includes a number of leaves for Seitz to address his problems, with no adverse consequences to him.  Wise's remark is thus insufficient to justify denial of summary judgment in light of the overwhelming evidence that, to the extent the restructuring was not already planned, it was based on performance issues, not FMLA leave.

### ii.    Seitz's FMLA Retaliation Claim

Seitz's last claim is that Lane Furniture terminated him because he exercised his right to take FMLA leave.  This is generally known as an FMLA "retaliation" or "discrimination" claim, and it is analyzed under the *McDonnell Douglas* burden-shifting approach.  *Edgar*, 443 F.3d at 508.  Seitz may satisfy the elements of his *prima facie* case by showing that (1) he availed himself of a protected

right under the FMLA; (2) he was subjected to an adverse employment action; and (3) there was a causal connection between the exercise of his FMLA rights and the adverse employment action. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 313-16 (6th Cir.2001). "If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee." *Edgar*, 443 F.3d at 508 (citing *Skrjanc*, 272 F.3d at 315). If the employer proffers a legitimate, non-discriminatory reason, the burden shifts back to the employee to show that the proffered reason is actually a pretext for unlawful discrimination. *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993).

Because the same burden-shifting analysis applies, the Court essentially analyzed this claim in the context of the discussion of Seitz's claims above. Briefly, although it appears Seitz has satisfied the low standard for his *prima facie* case, he cannot shoulder his burden with respect to pretext. *Id.* (holding that the ultimate burden of persuasion always remains with the plaintiff). Seitz cannot overcome, and in many respects does not even challenge, Lane Furniture's evidence -- in the form of deposition testimony, declarations by customers, medical records, telephone records, and email correspondence -- indicating that he was terminated because he was performing so inadequately in December of 2005 that he was damaging the company's relationships with its customers, not because he took FMLA leave.

## IV.   CONCLUSION

After thorough review of the briefs and exhibits it is clear that alcohol ruined Michael Seitz's career. The Court acknowledges the severity of Seitz's disease and sympathizes with his plight. The Court is also impressed by Seitz's exemplary performance as a sales representative while he maintained his sobriety for many years, as well as by Sam Wise's compassionate approach to

-47-

managing Seitz through his difficult periods.  With all of this in mind, it is also clear that the law is not designed to protect Seitz from losing his job under the circumstances of this case.  The Court recognizes that this is a harsh result, but Lane Furniture had the right to keep its business running; in this case, the law does not require Lane Furniture to retain Seitz if it decides that his performance deficiencies are harming the company.

For all of the foregoing reasons, Defendant Lane Furniture's *Motion for Summary Judgment* (Doc. 35) is **GRANTED**.  Plaintiff Michael Seitz's *Motion for Partial Summary Judgment* (Doc. 36) is **DENIED**.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 17, 2008**

-48-